1
2
3
4
5
6
7    **UNITED STATES DISTRICT COURT**
8    **CENTRAL DISTRICT OF CALIFORNIA**
9

| | |
|---|---|
| 10  PATAGONIA, INC., | Case No. 2:25-cv-03283-CV-SK |
| 11        Plaintiff, | **PRELIMINARY INJUNCTION ORDER** |
| 12     v. | |
| 13  FRANCES AGNEW DBA FRAN CALISTA, FRAN CALISTA CLOSET | |
| 14  LLC, ALL THINGS ALI, LLC, SHOP ORC LLC, ALISON RAE FEASTER, | |
| 15  BROOKE L. HUNSUCKER DBA BROOKE LEANN ALLEN, BAILEY | |
| 16  RENAE MILLER, JEFFREY FRANCIS MOORE, LEE WILLIAM, | |
| 17  COLSON TY AGNEW, PUTIAN LOMANDO TRADING CO., LTD and | |
| 18  DOES 1–10, | |
| 19        Defendants. | |

20
21
22
23
24
25
26
27
28

1

Plaintiff Patagonia, Inc. ("Patagonia") is a California company that designs, develops, and markets clothing and other accessories. Patagonia alleges that Defendants Francis Agnew aka Francis Marie Agnew or Fran Calista; Fran Calista Closet LLC; Shop ORC LLC; Jeffrey Francis Moore; Alison Rae Feaster; Brooke L. Hunsucker aka Brooke Leann Allen; Bailey Renae Miller; Lee William; All Things Ali, LLC; Colson Ty Agnew; and Putian Lomando Trading Co., Ltd. ( "Putian," and collectively, "Defendants")[1] have conspired to import, promote, offer for sale, and sell counterfeit Patagonia products bearing one or more reproductions of Patagonia's federally registered trademarks.

On May 7, 2025, the Court entered a temporary restraining order (the "TRO") enjoining Defendants' use and sale of products displaying Patagonia's trademarks, ordering preservation and production of certain records, and prohibiting Defendants from access to assets related to the counterfeiting activities Patagonia alleged. Doc. #23. In addition, the TRO ordered non-parties PayPal Holdings, Inc. ("PayPal"); Meta, Inc. ("Meta"); Telegram Messenger, Inc. ("Telegram"); and Shopify, Inc. ("Shopify," and collectively "Non-Parties") to voluntarily comply with certain terms in the TRO or to show cause within seven days after service of the TRO why they should not be enjoined by the terms of the order. *Id*. at 27–31.

Patagonia now seeks a preliminary injunction that will likewise protect Patagonia's trademarks and preserve the status quo until final disposition of this case. On May 21, 2025, the Court extended the TRO until June 4, 2025 (28 days from issuance of the TRO). The Court set the preliminary injunction hearing for June 4, 2025.

The Court has reviewed and considered all briefing and papers filed with respect to Patagonia's Renewed Motion for Temporary Restraining Order, and all filings

---

[1] *See* Doc. # 16-1, Ex. A, for Patagonia's compilation of Defendants, Defendants' known aliases, Defendants' email addresses, online storefronts associated with each Defendant, and possible contact information for each Defendant. The Court has reproduced this information as **Exhibit B** attached to this Order.

2

regarding the issuance of a preliminary injunction, including Meta's May 28, 2025 Response Regarding Restraining Order (Doc. # 59) and supporting declaration (Doc. # 60), Defendants Frances Agnew DBA Fran Calista, Fran Calista Closet LLC, All Things Ali, LLC, ORC Shop LLC, Alison Rae Reaster, Brooke L. Hunsucker dba Brooke Leann Allen, Bailey Renae Miller, Jeffrey Francis Moore and Colson Ty Agnew's ("Represented Defendants") May 30, 2025 Opposition to Preliminary Injunction (Doc. # 68), Patagonia's June 1, 2025 Opposition to Meta's Response (Doc. # 69) and supporting declaration (Doc. # 70), Patagonia's June 3, 2025 Reply (Doc. # 71) and supporting declaration (Doc. # 71-1).

The Court heard oral arguments at the June 4, 2025 hearing at which the Court had ordered Defendants to show cause why a preliminary injunction should not issue. Counsel for Patagonia, Represented Defendants, and Meta appeared at the June 4, 2025 hearing. Defendants Lee William and Putian, and non-parties Telegram, Shopify, and PayPal have not appeared in this case and have not offered any opposition or objection to the issuance of a preliminary injunction.

The Court now finds that Patagonia has adequately demonstrated the need for a preliminary injunction and, with good cause having been found, hereby GRANTS Patagonia's request for preliminary injunction as to the Defendants that have been served, namely, Represented Defendants and Lee William. The Court also finds it appropriate to include Shopify and Meta in the preliminary injunction.

## I.    BACKGROUND

Patagonia was founded in the early 1970s to design and sell climbing clothes and other active sportswear. Declaration of Traci Escamilla in Support of Renewed Application (Doc. # 18, "Escamilla Decl.") ¶ 5. Over the last fifty years, Patagonia has applied for and obtained numerous trademark registrations for the PATAGONIA brand and the P-6 logo; a multi-colored label inspired by a silhouette of the jagged peaks of the Mt. Fitz Roy skyline. *Id.* ¶¶ 5, 7. These registrations are identified below (collectively, the "PATAGONIA Marks"):

| Trademark | Reg. No. / Reg. Date | Goods | Date of First Use |
|---|---|---|---|
| **PATAGONIA** | 1189402 / Feb. 9, 1982 | Men's and Women's Clothing-Namely, Sweaters, Rugby Shirts, Walking Shorts, Trousers, Jackets, Mittens, Hoods and Rainwear | 08/1974 |
|  | 1294523 / Sept. 11, 1984 | Men's, Women's and Children's Clothing-Namely, Jackets, Pants, Vests, Gloves, Pullovers, Cardigans, Socks, Sweaters, Underwear, Shirts, Shorts, Skirts and Belts | 08/1974 -1981 |
|  | 1547469 / July 11, 1989 | Men's, Women's and Children's Clothing-Namely, Jackets, Pants, Shirts, Sweaters, Vests, Skirts, Underwear Tops and Bottoms, Socks, Gloves, Mittens, Hats, Face Masks, Balaclava, Gaiters, Suspenders, and Belts | 08/1974 -1981 |
|  | 1775623 / June 8, 1993 | Luggage back packs, and all-purpose sports bags | 08/1988 |
| **PATAGONIA** | 1811334 / Dec. 14, 1993 | Luggage, back packs, fanny packs and all-purpose sport bags, footwear, ski bags and ski gloves | 08/1990 |
| **PATAGONIA** | 2260188 / July 13, 1999 | Computerized on-line ordering activities in the field of clothing and accessories; Providing information in the field of technical clothing and accessories for use in | 10/1995 |

| Trademark | Reg. No. / Reg. Date | Goods | Date of First Use |
|---|---|---|---|
| | | recreational, sporting and leisure activities; providing information in the field of existing and evolving environmental issues | |
| **PATAGONIA** | 2662619 / Dec. 17, 2002 | Retail store services featuring clothing, footwear, luggage and a wide variety of sporting goods and accessories | 06/1986 |
| **PATAGONIA** | 5491401 / June 12, 2018 | Reusable bottles sold empty; insulated containers for food or beverage for domestic use; cups, mugs and growlers | 09/2014 |
| **PATAGONIA** | 5561006 / Sept. 11, 2018 | Stickers; paper banners; fiction and non-fiction books on a variety of topics; posters; non-magnetically encoded gift cards; photographs | 12/1991 |

*Id.* ¶¶ 5, 7.

Patagonia has acquired substantial goodwill in its PATAGONIA Marks by promoting and investing in its brand. *Id.* ¶¶ 12–15. Patagonia has acquired a reputation for offering high-quality products under the PATAGONIA Marks and invests significant time and resources in the manufacturing process to safeguard this reputation. *Id.* ¶¶ 16–17. Patagonia also maintains strict control over the sale and distribution of its products by limiting sales to controlled channels such as Patagonia's online website, Patagonia's retail stores, and Patagonia's outlet stores, and by monitoring excess inventory. *Id.* ¶¶ 18–19.

Patagonia also maintains a robust brand protection and enforcement program, whereby Patagonia diligently and aggressively pursues individuals and/or entities who, without Patagonia's consent, import, distribute, sell, and/or offer for sale counterfeit

Patagonia products. *Id*. ¶¶ 20–23. Counterfeit products are harmful to Patagonia's brand and reputation because consumers are led to believe they are purchasing high quality Patagonia products when they are really purchasing inferior goods. *Id*. ¶¶ 23, 28, 31. Indeed, Patagonia sometimes detects counterfeit schemes when consumers attempt to return counterfeit products to Patagonia stores complaining of poor quality and defects. *Id*. ¶ 22.

As part of its effort to detect imports of counterfeit Patagonia goods, Patagonia has registered its trademarks with U.S. Customs and Border Protection ("CBP") to allow the agency to identify and seize counterfeit products. *Id*. ¶ 21. In December 2024, Patagonia received two seizure reports from CBP reporting that sixty counterfeit Patagonia products had been imported, and that CBP had seized them. *Id*. ¶ 24. Patagonia commenced an investigation that culminated in the present lawsuit. *Id*. ¶¶ 24–27; Declaration of Paymaneh Parhami ISO Renewed Application, filed on April 23, 2025 (Doc. # 19, "April 23 Parhami Decl.") ¶¶ 3–53.

Defendants are individuals and corporate entities that Patagonia alleges to be co-conspirators in a scheme to import, promote, offer for sale, and sell counterfeit Patagonia products bearing one or more reproductions of the PATAGONIA Marks. *See* Complaint for Counterfeiting, Trademark Infringement, Unfair Competition, Dilution, and Copyright Infringement (Doc. # 12, "Compl.") ¶¶ 2–14; April 23 Parhami Decl. ¶¶ 21–25, 28, 29, 50, 51. Patagonia alleges that Defendants obtain counterfeit Patagonia products from unauthorized sources in China. Compl. ¶¶ 34, 37; April 23 Parhami Decl. ¶¶ 10, 48. Defendants allegedly sell counterfeit Patagonia products to tens of thousands through private groups on Facebook and Telegram, online platforms like Shopify, and accept payment via PayPal and other processors. April 23 Parhami Decl. ¶¶ 7– 9, 12, 14–25, 27–30, 37, 51. Defendants also use warehouses in Los Angeles through which they ship counterfeit products. *Id*. ¶ 47.

Patagonia has also alleged that Defendants take steps to hide their operation, including by restricting access to the social media groups used to promote and sell the

counterfeit goods, routinely shutting down and creating new online stores, and by using code words and abbreviations in their online promotions. *Id.* ¶¶ 14, 19, 26, 27, 31–34, 57. Patagonia has also found that shipping labels received by their investigator from test purchases from Defendants bear the name of a shipper in Los Angeles who matches the name of a Los Angeles man who was convicted and sentenced to prison for a similar counterfeiting scheme of counterfeit apparel in 2014. *Id.* ¶ 49, Exh. 19.

On April 15, 2025, Patagonia filed its Complaint and applied for a Temporary Restraining Order ("TRO"). *See* Docs. # 1, 9. On April 18, 2025, the Court denied Patagonia's TRO Application without prejudice. Doc. # 11. On April 23, 2025, Patagonia renewed its request for TRO seeking to "enjoin[] Defendants from conducting their counterfeiting scheme; freez[e] assets to ensure the availability of damages suffered, and expedit[e] discovery to identify participants and information about the manufacturing and sale of the counterfeit products, in addition to accounts and funds used to perpetrate the scheme." Docs. ## 13–19. The TRO Application also named specific non-parties. Doc. # 13. On May 7, 2025, the Court granted Patagonia's Renewed TRO. Doc. #23. Because the TRO was scheduled to expire on May 21, 2025, and some Defendants had not yet been served, the Court extended the TRO to June 4, 2025 and made additional orders regarding service and briefing of the proposed preliminary injunction, including allowing Defendants to file any opposition up to June 2, 2025, with Patagonia filing any Reply by June 3, 2025. Doc. # 36.[2]

---

[2] At the June 4, 2025 hearing, counsel for the Represented Defendants repeatedly claimed he lacked sufficient time to prepare a thorough objection to the preliminary injunction, citing recent retention and formal service on May 28, 2025. This argument does not have merit. Defendant Jeffrey Moore appeared at the May 21 hearing and confirmed that he and the other Represented Defendants had received case materials from Patagonia's counsel and were seeking legal representation. *See also* Doc. # 74 (detailing Patagonia's efforts to provide notice and serve Defendants). Indeed, at the June 4 hearing, defense counsel admitted he first spoke with Mr. Moore before the May 21 hearing and advised him to appear *pro se* to request more time. The Court granted a 14-day continuance for Defendants to receive notice, retain counsel, and prepare a response. *See* Doc. #36. This was the maximum extension permitted under Rule 65(b)(2) absent Defendants' consent. Had Defendants agreed to extend the TRO, the Court would have granted further time. The Court also rejects the claim that counsel lacked access to necessary filings before the case was unsealed on June 2.

## II.    LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right[.]" *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (cleaned up). An injunction is binding only on parties to the action, their officers, agents, servants, employees, and attorneys, and those "in active concert or participation" with them. Fed. R. Civ. P. 65(d)(2). "The court may issue a preliminary injunction only on notice to the adverse party." Fed. R. Civ. P. 65(a)(1).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In the Ninth Circuit, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (cleaned up).

## III.    DISCUSSION

### A.    Preliminary Injunction

Patagonia seeks a preliminary injunction enjoining Defendants from conducting their counterfeiting scheme; freezing assets to ensure the availability of damages suffered; and expediting discovery to identify participants and information about the manufacturing and sale of the counterfeit products, in addition to accounts and funds used to perpetrate the scheme. As detailed below, the Court finds the four *Winter* factors weigh in favor of issuing a preliminary injunction.

---

Patagonia was ordered to provide Defendants with relevant materials, and Patagonia's counsel has demonstrated their willingness to supply case documents when requested. *See* Doc. ## 71-2, 74. Finally, defense counsel's complaints conflict with his actions; he filed the opposition brief on behalf of Represented Defendants on May 30—*three days before the June 2 deadline*. *See* Doc. #36 at 7.

8

### 1.    Patagonia is Likely to Succeed on the Merits

Patagonia must first show that it is likely to succeed on the merits of its trademark infringement or counterfeiting claim. *Winter*, 555 U.S. at 20. To establish that it is likely to succeed on the merits of its trademark infringement claim, Patagonia must show (1) that it is the owner of a valid, protectable mark and (2) that Defendants are using a mark in such a way that is likely to cause confusion, or to cause mistake, or to deceive. *Grocery Outlet, Inc. v. Albertson's, Inc.*, 497 F.3d 949, 951 (9th Cir. 2007) (per curiam); *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1196 (9th Cir. 2009). To establish that it is likely to prevail on its counterfeiting claim, Patagonia must also show that Defendants knowingly and intentionally offered, sold, or distributed counterfeit products using the PATAGONIA marks. *State of Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.*, 425 F.3d 708, 721 (9th Cir. 2005); *Arcona, Inc. v. Farmacy Beauty, LLC*, 976 F.3d 1074, 1078 n.2 (9th Cir. 2020).

The Court finds that Patagonia has made such a showing.

*First*, Patagonia has shown that it owns valid, protectable trademark registrations for the PATAGONIA Marks for clothing and accessories. Escamilla Decl. ¶ 7, Ex. A. Registration of a mark in the principal register of the USPTO is *prima facie* evidence of the validity of the registered mark and of a plaintiff's exclusive right to use the mark on the goods and services specified in the registration. *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1047 (9th Cir. 1999).

*Second*, Patagonia's evidence demonstrates that Defendants have used the PATAGONIA Marks in offering for sale, selling, and distributing products in such a way that is likely to cause confusion. "To determine whether a likelihood of consumer confusion exists," courts in the Ninth Circuit rely "on the eight-factor *Sleekcraft* test, which reviews: (1) the strength of the mark; (2) proximity or relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) the defendant's intent in selecting the mark; and (8) the likelihood of expansion of

the product lines." *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1106 (9th Cir. 2016) (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979), *abrogated in part on other grounds by Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 810 (9th Cir. 2003)). "The factors are non-exhaustive and applied flexibly; the *Sleekcraft* factors are not intended to be a rote checklist." *Id.* (cleaned up).

Here, Patagonia's evidence shows that Defendants have sold clothing and accessories containing the PATAGONIA Marks that are designed to look identical to authentic Patagonia clothing and accessories. Escamilla Decl. ¶ 27; April 23 Parhami Decl. ¶¶ 38–46.[3] Where a defendant uses identical marks in connection with the same goods, many courts in the Ninth Circuit have held that it is unnecessary to perform a step-by-step examination, because counterfeit marks are inherently confusing.[4] In any event, Patagonia meets the *Sleekcraft* likelihood of confusion standard. Patagonia has used its trade name and the PATAGONIA Marks for decades in connection with clothing and accessories such that the marks are widely recognized and well-known to the public, so the marks are strong (*Sleekcraft* factor 1). *See* Escamilla Decl. ¶¶ 7, 12–15, Ex. A. Defendants have been selling the same kinds of products as Patagonia—clothing and accessories (*Sleekcraft* factor 2). *See* April 23 Parhami Decl. ¶¶ 33, 38, 39, 41–45. Defendants have used Patagonia's identical or highly similar marks and trade names on the products themselves and in their online promotions (*Sleekcraft*

---

[3] Patagonia has confirmed that it has not authorized Defendants' use of the PATAGONIA Marks nor is it associated or affiliated with Defendants in any way. Escamilla Decl. ¶ 18, Parhami Decl. ¶ 46.

[4] *See Seiko Epson Corp. v. Nelson*, No. 5:21-cv-00320 JWH-SP, 2021 WL 5033486, at *3 (C.D. Cal. Mar. 31, 2021) ("In counterfeiting cases, the Court assumes a likelihood of confusion when the offending mark is counterfeit or virtually identical to a protected mark and is used on an identical product or service."); *Ubiquiti Networks, Inc. v. Kozumi USA Corp.,* No. C 12-2582 CW, 2012 WL 2343670, at *14 (N.D. Cal. June 20, 2012) (finding that plaintiff has established likelihood of success on counterfeiting claim without assessing likelihood-of-confusion factors for the purpose of granting TRO motion); *Phillip Morris USA Inc. v. Shalabi*, 352 F. Supp. 2d 1067, 1073 (C.D. Cal. 2004); *Microsoft Corp. v. Buy More, Inc.*, 136 F. Supp. 3d 1148, 1157 (C.D. Cal. 2015), *aff'd*, 703 F. App'x 476 (9th Cir. 2017) (quoting *Phillip Morris*, 352 F. Supp. 2d at 1073); *Daimler AG v. A-Z Wheels LLC*, 334 F. Supp. 3d 1087, 1096 (S.D. Cal. 2018) (citing *Phillip Morris*, 352 F. Supp. 2d at 1073).

factor 3). *See id.* ¶¶ 38–46, 57. And the use of identical products shows Defendants intended to confuse or deceive the public (*Sleekcraft* factor 7). *See also Brookfield Commc'ns, Inc.*, 174 F.3d at 1056 ("In light of the virtual identity of marks, if they were used with identical products or services likelihood of confusion would follow as a matter of course.").

*Third*, Patagonia has presented evidence that Defendants knowingly and intentionally sold counterfeit Patagonia products. For example, Patagonia's evidence shows that Defendants promoted the counterfeit products in private, invitation-only social media groups and directed customers to purchase the counterfeit products through public websites that use photos of unbranded products, abbreviated terms, and codes names that correspond to the promotional posts within the closed social media groups. April 23 Parhami Decl. ¶ 14, 32, 33, 57. Patagonia has also shown that Defendants periodically shut down their online storefronts from which they offered the counterfeit products and create new ones with new links. *Id.* ¶¶ 31, 57. This conduct suggests Defendants know their operation is illegitimate.

*Fourth*, Patagonia's evidence demonstrates that Defendants have acted jointly in selling counterfeit Patagonia products and are properly named together as Defendants. Defendants used the same private social media groups to promote and sell counterfeit Patagonia products, adopted similar strategies for promoting these sales while avoiding detection, and have used the same seller for payments and the same warehouse in Los Angeles for shipping products. *See generally* April 23 Parhami Decl. "Courts in the Ninth Circuit have held that in patent, trademark, literary property, and copyright infringement cases, any member of the distribution chain of allegedly infringing products can be jointly and severally liable for the alleged misconduct." *Adobe Sys. Inc. v. Blue Source Grp., Inc.*, 125 F. Supp. 3d 945, 973 (N.D. Cal. 2015) (cleaned up).

Patagonia has provided evidence that a substantial part of the events giving rise to Patagonia's claims arose in this district (April 23 Parhami Decl. ¶¶ 43–44, 47, 52),

making venue appropriate under 28 U.S.C. §§ 1391 and 1400(a). *See Arcona, Inc. v. Farmacy Beauty, LLC*, No. 2:17-CV-07058 ODW-JPR, 2018 WL 1441155, at *7 (C.D. Cal. Mar. 22, 2018).

The Court notes that there is no dispute here that Patagonia is likely to succeed on their trademark and counterfeiting claims. In their May 30, 2025 Opposition (Doc. # 68), Represented Defendants do not offer any argument or evidence to contest that Patagonia is likely to succeed on the merits in this case. *See generally* Doc. # 65. Meta's brief objecting to the issuance of a TRO also does not contest Patagonia's showing of a likelihood of success on the merits. *See generally* Doc. # 59. Non-parties Shopify, and PayPal, and Defendants Lee William have offered no opposition after having been provided notice. The failure of these defendants and non-parties to contest this issue means that they have waived any argument in opposition. *See Taferner v. Inspire Brands, Inc.*, No. 2:24-CV-05711-WLH-AGR, 2025 WL 942498, at *11 n.15 (C.D. Cal. Mar. 25, 2025) ("[A] failure to address an argument in an opposition brief constitutes waiver with respect to that issue[.]") (citing *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1132 (C.D. Cal. 2011)); C.D. Cal. L. Civ. R. 7-12 ("The failure to file any required document, or the failure to file it within the deadline, may be deemed consent to the granting or denial of the motion[.]").[5]

The Court therefore finds that Patagonia has demonstrated a likelihood of success on the merits with respect to its trademark infringement and trademark

---

[5] At the June 4, 2025 hearing, counsel for Represented Defendants claimed the Court lacks personal jurisdiction over Defendants because many do not reside in California. This issue was not raised in Represented Defendants' opposition brief. To the extent this argument was not waived, it has no merit because Patagonia has provided evidence that Defendants are using interactive online platforms accessible to customers in California and Defendants have sold and shipped physical goods to California customers in this district. April 23 Parhami Decl. ¶¶ 8-9, 11–30, 37–44, 47–52. Accordingly, this Court has personal jurisdiction over Defendants. *Herbal Brands, Inc. v. Photoplaza, Inc.*, 72 F.4th 1085, 1088 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 693 (2024) ("[I]f a defendant, in its regular course of business, sells a physical product via an interactive website and causes that product to be delivered to the forum, the defendant has purposefully directed its conduct at the forum such that the exercise of personal jurisdiction may be appropriate.").

1  counterfeiting claims.

2      **2.**       **Patagonia Would Suffer Irreparable Harm Absent Relief**

3        Patagonia must demonstrate that it is likely to suffer irreparable harm in the

4  absence of a preliminary injunction. *See Winter*, 555 U.S. at 20. "Normally, a party

5  seeking a permanent injunction must show," among other things, "(1) that it has

6  suffered an irreparable injury; [and] (2) that remedies available at law, such as

7  monetary damages, are inadequate to compensate for that injury[.]" *Y.Y.G.M. SA v.*

8  *Redbubble, Inc.*, 75 F.4th 995, 1005 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 824, (2024)

9  (citing cases). "The Lanham Act adds a statutory layer to the irreparable harm analysis

10  for trademark infringement," however, that benefits trademark holders who seek

11  injunctive relief to protect their trademarks. *Id*. Under the Lanham Act, as amended in

12  2020, a trademark holder who seeks an injunction to protect against infringement "shall

13  be entitled to a rebuttable presumption of irreparable harm . . . upon a finding of

14  likelihood of success on the merits for a violation identified in this subsection in the

15  case of a motion for a preliminary injunction or temporary restraining order." 15 U.S.C.

16  § 1116(a); *JUUL Labs, Inc. v. Chou*, 676 F. Supp. 3d 827, 849 (C.D. Cal. 2023)

17  ("Congress has recently made it easier for trademark plaintiffs to obtain an injunction,

18  amending the Lanham Act to provide that such plaintiffs shall be entitled to a

19  rebuttable presumption of irreparable harm upon a finding of a violation identified in

20  this subsection.") (cleaned up). The burden then shifts to the defendant to rebut the

21  presumption of irreparable harm. *See Shakeys Pizza Asia Ventures, Inc. v. PCJV USA,*

22  *LLC*, No. 24-7084, 2025 WL 1431270, at *2 (9th Cir. May 19, 2025) ("Under the

23  Lanham Act, a showing of a likelihood of success on the merits creates a rebuttable

24  presumption of irreparable harm, 15 U.S.C. § 1116(a), which the district court

25  reasonably found [defendant] failed to rebut."); *accord*, *AK Futures LLC v. Boyd Street*

26  *Distro, LLC*, 35 F.4th 682, 694 (9th Cir. 2022); *Vision Wheel, Inc v. Vision Forged*,

27  732 F. Supp. 3d 1161, 1166 (C.D. Cal. 2024).

28        Here, Patagonia has provided evidence that it is the registrant of the

PATAGONIA marks (Doc. # 18 ¶ 7, Exh. A). Patagonia has also shown that it is likely to succeed on its trademark infringement and trademark counterfeiting claims. *See* Section A.1 above. Based on this showing, under the Lanham Act Patagonia "is entitled to a rebuttable presumption of irreparable harm on its trademark claim because the company has shown it will likely succeed on the merits." *AK Futures LLC*, 35 F.4th at 694 (affirming issuance of preliminary injunction issued pursuant to the Lanham Act and finding of irreparable harm based on unrebutted statutory presumption of irreparable harm).

To further support a finding of irreparable harm, Patagonia has provided a declaration from Ms. Traci Escamilla, Patagonia's Senior Brand Protection Paralegal responsible for managing brand protection. Doc. # 18 ¶ 1. Based on her familiarity with Patagonia's efforts to protect the PATAGONIA's marks, her knowledge of how counterfeiters negatively affect Patagonia's brand, reputation for quality, and consumer goodwill, and her observations of Defendants' alleged counterfeiting in particular, Ms. Escamilla concludes that "Defendants' conduct has caused and continues to cause irreparable harm to Patagonia's goodwill which cannot be adequately addressed by awarding damages after-the-fact." *Id*. ¶¶ 11–30.

Represented Defendants present no evidence to rebut the presumption of irreparable harm. Instead, they offer three arguments for why there is no irreparable injury. None are persuasive.

### (a) Patagonia's Injury is Not Redressable Through Monetary Damages

Represented Defendants first argue that any harm from their past misconduct is purely economic and compensable by money damages. Doc. # 68 at 8–10. But here Patagonia has explained why, absent an injunction, Patagonia will suffer harm that money damages alone cannot fix. Doc. # 18 ¶¶ 13, 17, 18, 23, 29, 30–31. Specifically, that Defendants' alleged counterfeiting harms Patagonia's reputation for high quality goods and consumer goodwill Patagonia has spent hundreds of millions of dollars and

decades cultivating, and that it is difficult, if not impossible, to quantify or correct these harms. Doc. # 18 ¶¶ 13, 17, 18, 23, 29, 30–31. Numerous cases, including Represented Defendants' cited authority, recognize that damage to reputation and consumer good will may constitute irreparable harm.[6]

### (b)    Defendants Have Failed to Rebut the Presumption of Irreparable Harm

Represented Defendants—who have provided no evidence of their own— argue that Patagonia's evidence is insufficient to show that Patagonia is likely to suffer irreparable harm absent an injunction. Doc. # 63 at 9–10, 14–15. Represented Defendants misunderstand the law.

Represented Defendants rely primarily on authorities that pre-date the 2020 amendment to the Lanham Act re-establishing the presumption of irreparable harm. For example, Defendants cite to *Herb Reed Enters., LLC*, 736 F.3d at 1250, to argue that "claimed damage to 'goodwill' or 'reputation' – often cited in intellectual property cases as a form of intangible harm – must be proven with evidence and cannot be presumed irreparable on mere say so[.]" Doc. # 63 at 9. In *Herb Reed Enters., LLC,* the Ninth Circuit recognized that "[e]vidence of loss of control over business reputation and goodwill could constitute irreparable harm," but that the plaintiff had not provided sufficient evidence for the district court to make a finding of irreparable harm. 736 F.3d at 1250–51. In the 2013 opinion, the Ninth Circuit opined that "gone are the days when once the plaintiff in an infringement action has established a likelihood of confusion, it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief does not issue." *Id*. at 1250 (cleaned up).

---

[6] *See, e.g.*, *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) ("Evidence of loss of control over business reputation and damage to goodwill could constitute irreparable harm."); *Clean Safety, Inc. v. Ruby Trucking LLC*, No. 521CV00225 JWH-SP, 2023 WL 5962610, at *8 (C.D. Cal. Aug. 7, 2023) ("The loss of prospective customers, goodwill, or reputation . . . supports a finding of an inadequacy of monetary damages. Such intangible injuries are irreparable because quantifying their harm is impractical, and such injuries cannot be fully remedied with a financial award.") (citation omitted); *Gucci Am., Inc. v. Los Altos Boots, Inc.*, No. CV1406680-BRO-AJW, 2014 WL 12561613, at *7 (C.D. Cal. Aug. 27, 2014) (finding declaration detailing risk of harm to goodwill and reputation sufficient to demonstrate a likelihood of irreparable harm).

Following the 2020 amendment of the Lanham Act, those days are back again. As described above, the statute clearly provides for a rebuttable presumption of irreparable harm upon a finding of likelihood of success. 15 U.S.C. § 1116(a). The Ninth Circuit cases that post-date this amendment reflect the change. For example, less than a month ago, the Ninth Circuit affirmed a district court's finding of irreparable harm based solely on the facts that the district court had determined the plaintiff was likely to succeed on the merits and because the defendants had failed to rebut the statutory presumption of irreparable harm. *Shakeys Pizza Asia Ventures, Inc* 2025 WL 1431270 at *2. The Ninth Circuit noted that the district court did not apply the wrong legal standard when making this finding. *Id*.; *see also AK Futures LLC,* 35 F.4th at 694 (affirming district court's finding of irreparable harm because the defendant failed to rebut the statutory presumption of irreparable harm where plaintiff had shown it would likely succeed on the merits).

Accordingly, because Patagonia has shown that it is likely to succeed on the merits of its trademark infringement and counterfeiting claims—which Defendants and Non-Parties do not dispute—it is Defendants' burden to provide evidence that rebuts the presumption of irreparable harm; it is not Patagonia's burden to prove that it has been irreparably harmed.[7]

### (c)    Represented Defendants' Unsupported Statement that it Has and/or Will Cease Infringement Does Not Rebut Presumption of Irreparable Harm

In certain cases, a defendant's agreement to maintain the status quo can be justification to find no irreparable harm and render a motion for a preliminary injunction moot.[8] The Ninth Circuit has made clear that a declaration by an infringer

---

[7] The Court also finds that Patagonia has done more than simply rely on the presumption of irreparable harm. It has provided a detailed declaration from an appropriate employee of Patagonia describing the irreparable harm that Patagonia faces here. Doc. # 18 ¶¶ 13, 17, 18, 23, 29, 30–31.

[8] *See, e.g.*, *Choudhuri v. Wells Fargo Bank, N.A.*, 691 F. App'x 877, 878 (9th Cir. 2017) ("The district court did not abuse its discretion by denying as moot Choudhuri's motion for a preliminary injunction because Choudhuri failed to establish a likelihood of irreparable harm in light of Wells Fargo's agreement to maintain the status quo pending the outcome of this case.").

that it would stop selling infringing products does not necessarily rebut the presumption of irreparable harm, however. For example, in *AK Futures LLC*, the Ninth Circuit affirmed the district court's finding that the trademark holder had shown irreparable harm. 35 F.4th at 694. There, the infringer submitted a declaration that it would stop selling the infringing products and argued that the declaration rebutted the presumption and the showing of irreparable harm. *Id.* Because the declaration "contain[ed] a number of admissions that call into question [the infringer's] ability to adequately control the flow of products through its store," suggesting "a business structure without safeguards against selling counterfeit products," the Ninth Circuit concluded that the declaration did not rebut the presumption. *Id.*

Here, Represented Defendants have not even provided a declaration stating that they will stop further infringement. Instead, they state through counsel in their opposition brief that they have "already ceased and/or agreed to cease" the alleged counterfeiting and they have no plans to "resume in the immediate future." Doc. # 68 at 10–11. They repeatedly state that they are "willing" to enter into an agreement to maintain the status quo with Patagonia, but they have not provided any proposed agreement or even described the terms of such an agreement. *See id.* at 12.

There is another, more fundamental problem with Represented Defendants' vague assurances: they are contradicted by evidence. Patagonia has provided a sworn declaration that some of the websites used to sell counterfeit Patagonia products were still active as of June 3, 2025—several days after Represented Defendants made their representations to the Court through counsel. Doc. # 71-1 ¶ 5. And Patagonia's counsel has stated, under oath, that despite soliciting input from Defendants regarding a compromise, Defendants did not provide any substantive response, nor did they comply with the terms of the TRO. *Id.* ¶ 4. At the June 4, 2025 hearing, counsel for Represented Defendants conceded that Represented Defendants have not produced any information or documents to Patagonia as required by the TRO. *See* Doc. # 23 at 26–27.

1   Accordingly, the Court finds that Patagonia has demonstrated that it is likely to

2   suffer irreparable harm, and this factor supports the issuance of a preliminary

3   injunction.

4   ### 3.       The Equities Favor Patagonia

5   The Court finds that the balance of equities also favors Patagonia. While

6   Defendants continued, unauthorized use of the PATAGONIA Marks threatens to

7   damage Patagonia's brand, reputation, and goodwill, the Court can identify no

8   prejudice to Defendants that would arise from a preliminary injunction enjoining them

9   from distributing counterfeit goods. *See Triad Sys. Corp. v. Se. Express Co.*, 64 F.3d

10  1330, 1338 (9th Cir. 1995) (explaining that a defendant "cannot complain of the harm

11  that will befall it when properly forced to desist from its infringing activities.")

12  *superseded by statute on other grands as stated in 2Die4Kourt v. Hillair Cap. Mgmt.,*

13  *LLC,* 692 F. App'x 366, 369 (9th Cir. 2017)); *Otter Prods., LLC v. Ace Colors Fashion,*

14  *Inc.,* No. 2:14-cv-00141-ODW-PJW, 2014 WL 4187947, at *6 (C.D. Cal. Aug. 21,

15  2014). This factor therefore weighs in favor of Patagonia.

16  ### 4.       Injunctive Relief is in the Public Interest

17  The Court finds that a preliminary injunction would be in the public interest. "In

18  trademark cases, the public interest is the public's right not to be deceived or

19  confused." *Warner Bros. Ent. v. Glob. Asylum, Inc.*, No. CV 12-9547 PSG-CW, 2012

20  WL 6951315, at *23 (C.D. Cal. Dec. 10, 2012), *aff'd sub nom. Warner Bros. Entm't*

21  *v. Glob. Asylum, Inc.*, 544 F. App'x 683 (9th Cir. 2013). Where "there is a likelihood

22  of consumer confusion created by the use of confusingly similar marks, it follows that

23  if such use continues, the public interest would be damaged." *Kos Pharm., Inc. v.*

24  *Andrx Corp.*, 369 F.3d 700, 730 (3d Cir. 2004) (cleaned up); *see also Daimler AG v.*

25  *A-Z Wheels LLC*, 498 F. Supp. 3d 1282, 1295–96 (C.D. Cal. 2020) ("Where

26  defendant's concurrent use of plaintiff's trademark without authorization is likely to

27  cause confusion, the public interest is damaged by the defendant's use.") (quoting

28  *AT&T Corp. v. Vision One Sec. Sys.*, No. 95-0565-IEG-BTM, 1995 WL 476251, at *7

18

1   (S.D. Cal. July 27, 1995)).

2   As detailed above, Defendants' practice of selling counterfeit Patagonia

3   products is likely to confuse the public. Accordingly, this factor supports the issuance

4   of a preliminary injunction that will preserve the *status quo* while Patagonia can

5   prosecute this action on the merits.

6   Because all four *Winter* factors favor Patagonia, the Court finds it appropriate

7   to issue a preliminary injunction protecting the PATAGONIA Marks.

8   **B.     Scope of the Requested Preliminary Injunction**

9   The Court must next determine the appropriate scope of the injunctive relief.

10  Federal Rule of Civil Procedure 65 requires that "[e]very order granting an

11  injunction and every restraining order must: (A) state the reasons why it issued;

12  (B) state its terms specifically; and (C) describe in reasonable detail—and not

13  by referring to the complaint or other document—the act or acts restrained or required."

14  Fed. R. Civ. P. 65(d)(1). "[A]n injunction must be narrowly tailored . . . to remedy

15  only the specific harms shown by the plaintiff[ ], rather than to enjoin all possible

16  breaches of the law." *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 1998)

17  (cleaned up).

18  **1.     Enjoining Defendants' Infringing Conduct**

19  The Court's May 7 order sets forth detailed, affirmative steps Defendants

20  must take to halt the alleged counterfeiting operation, turn over to Patagonia

21  potentially relevant evidence of counterfeiting, and preserve assets to assure the

22  availability of permanent relief. TRO at 24–27. The TRO also required Defendants

23  to provide service of the Order to all social media platforms, ecommerce sites,

24  platforms, or hosts, electronic payment processing platforms, merchant credit card

25  accounts, and messaging apps where Defendants have accounts. Defendants also

26  were ordered to take steps to recall counterfeit Patagonia products and deliver them

27  to Patagonia's counsel. It appears, possibly through the actions of non-parties, that

28  some of the social media platforms through which Defendants conducted the alleged

counterfeiting have been disabled. May 20 Ferrari Decl. ¶ 6. But there is no evidence that Defendants otherwise have complied with the TRO, other than their denials that sales of counterfeit products persist. Indeed, as of June 3, 2025, several websites Defendants used to sell counterfeit Patagonia products remain active. Doc. # 71-1 ¶5.

The Lanham Act authorizes courts to issue injunctive relief "according to principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark . . . ." 15 U.S.C. § 1116(a). The Court is also required to award relief under § 1117 adequate to make willful trademark infringement unprofitable and is authorized by its inherent equitable power to issue provisional remedies ancillary to its authority to provide final equitable relief. *Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552, 559 (9th Cir. 1992). While specific injunctive relief differs depending on the particular case, the terms proposed by Patagonia regarding Defendants have precedent in other trademark counterfeiting cases. In such cases, courts have restrained defendants from using defendants' marks[9] and from destroying potentially relevant evidence.[10] Courts have also required defendants to produce records and other evidence to plaintiff's counsel[11], to recall products sold with the plaintiff's trademarks[12], and freeze assets to ensure the

---

[9] *See, e.g.*, *MetaQuotes Ltd. v. MetaQuotes Software Corp.*, No. 8:22-CV-00462-SB-DFM, 2022 WL 1266659, at *6 (C.D. Cal. Apr. 27, 2022); *SunL Grp. (L.A.), Inc. v. Seaseng, Inc.*, No. EDCV 07-807-VAP-OP, 2007 WL 4144992, at *6 (C.D. Cal. Sept. 14, 2007); *Toyo Tire USA Corp. v. Mandala*, No. 8:20-CV-00502 JLS-KES, 2020 WL 5371513, at *8 (C.D. Cal. Aug. 4, 2020); *Knorr-Naehrmittel Aktiengesellchaft v. Knorr Sols., Inc.*, No. CV 1008155 GAF-RZ, 2012 WL 13005959, at *8 (C.D. Cal. Apr. 5, 2012); *Athleta, Inc. v. Pitbull Clothing Co.*, No. CV 12-10499-CAS-FMO, 2013 WL 142877, at *12 (C.D. Cal. Jan. 7, 2013).

[10] *See, e.g.*, *Cisco Sys., Inc. v. Wuhan Wolon Commc'n Tech. Co.*, No. 5:21-CV-04272-EJD, 2021 WL 4962661, at *14 (N.D. Cal. July 23, 2021); *Louis Vuitton Malletier, S.A. v. 2012louisvuittonhandbag.com*, No. 13-20840-CIV, 2013 WL 12094862, at *7 (S.D. Fla. Mar. 22, 2013).

[11] *See, e.g.*, *Asmodus, Inc. v. Junbiao Ou*, No. EDCV 162511JGB-DTB, 2017 WL 2954360, at *5 (C.D. Cal. May 12, 2017) *Cisco Sys., Inc. v. Shenzhen Usource Tech. Co.*, No. 5:20-CV-04773-EJD, 2020 WL 5049762, at *17 (N.D. Cal. Aug. 10, 2020).

[12] *See, e.g.*, *Asmodus, Inc. v. Junbiao Ou*, No. EDCV 16:2511-JGB-DTB, 2017 WL 2954360, at *7 (C.D. Cal. May 12, 2017); *see also Clorox Co. v. SSARM Inc.*, No. 2:23-CV-04122-ZNQ, 2023 WL 11957488, at *5 (D.N.J. Aug. 23, 2023).

1    availability of final relief[13].

2         Accordingly, the Court finds that given the facts of this case, a preliminary

3    injunction enjoining Defendants and requiring certain affirmative actions as described

4    below is appropriate.

5              **2.    Application of the Injunction to Non-Party Conduct**

6         Federal Rule of Civil Procedure 65 provides for injunctive relief that "binds only

7    . . . (A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys;

8    and (C) other persons who are in active concert or participation with anyone described"

9    in subsections (A) and (B). Fed. R. Civ. P. 65(d)(2); *see also Whole Woman's Health*

10   *v. Jackson*, 595 U.S. 30, 44 (2021) ("[U]nder traditional equitable principles, no court

11   may lawfully enjoin the world at large[.]") (cleaned up). For an injunction to bind a

12   non-party, the movant must show that (1) the non-party has actual notice of the

13   enjoined conduct and (2) either aided and abetted the enjoined party in the unlawful

14   conduct or that the non-party is "legally identified" with the enjoined party. *Consumer*

15   *Fin. Prot. Bureau v. Howard L., P.C.*, 671 F. App'x 954, 955 (9th Cir. 2016) (cleaned

16   up); *N.L.R.B. v. Sequoia Dist. Council of Carpenters, AFL-CIO*, 568 F.2d 628, 633

17   (9th Cir. 1977); *cPanel, LLC v. Asli*, 719 F. Supp. 3d 1133, 1154 (D. Or. 2024).

18        Courts in the Ninth Circuit often enjoin the activities of specific non-parties

19   connected with the alleged trademark infringement and require non-parties to take

20   affirmative steps to freeze assets and preserve potentially relevant evidence.[14]

---

21   [13] *See, e.g.*, *Cisco Sys., Inc. v. Shenzhen Usource Tech. Co.*, No. 5:20-CV-04773-EJD, 2020 WL
22   5199434, at *10 (N.D. Cal. Aug. 17, 2020) (restraining any financial institution holding any assets
      owed or held on account of any of the enjoined parties); *Levi Strauss & Co. v. Sunrise Int'l Trading*
23   *Inc.*, 51 F.3d 982, 987–88 (11th Cir. 1995) (affirming preliminary injunction freezing assets of U.S.-
24   based defendants who arranged for making counterfeit Levi's jeans in China for sale in Europe);
      *Chanel, Inc. v. P'ships or Unincorporated Ass'ns Identified on Schedule "A"*, No. C-13-02645-RS,
25   2013 WL 12120213, at *1 (N.D. Cal. June 14, 2013) (requesting equitable relief invokes the district
26   court's inherent equitable powers to order preliminary relief, including an asset freeze, in order to
      assure the availability of permanent relief).
27   [14] *See, e.g.*, *JUUL Labs, Inc. v. Chou*, No. CV 21-3056 DSF-PD, 2021 WL 4900374, at *12 (C.D.
      Cal. June 9, 2021) (naming specific payment processing providers and ordering them to freeze
28   defendants' assets and provide counsel for plaintiff an accounting of such assets); *Cisco Sys.*, 2020

However, some courts have narrowed the scope of requested injunctions where the moving party did not sufficiently establish a connection between the non-party and the infringing activities.[15]

*cPanel, LLC v. Asli*, 719 F. Supp. 3d 1133 (D. Or. 2024) addresses this divergence. There, the court found that the plaintiff had satisfied all four *Winter* factors but found the requested preliminary injunction to be overbroad as to non-parties. *Id*. at 1153–54. The court found that it was inappropriate to expressly name non-parties Cloudflare, Google, Porkbun, and Private by Design in the requested injunction because they had not been given notice or an opportunity to be heard, and because Plaintiff had failed to show that the non-parties were either in privity with defendants or that they aided or abetted defendants in their activities. *Id*. at 1154–55. The court modified the requested injunction to state "to the extent Plaintiff seeks to have non-parties expressly named in the terms of this injunction, Plaintiff must serve this opinion and injunction to those non-parties and provide them an opportunity to be heard in this Court under Federal Rule of Civil Procedure 65." *Id*. at 1156.

In its application for a TRO, Patagonia presented evidence that the Non-Parties' respective platforms and services were integral to the Defendants alleged counterfeiting operation.[16] Patagonia has also shown it is time-consuming and

---

WL 5199434, at *17 (naming specific non-party internet search engines and common carriers and requiring these non-parties to take affirmative steps to stop the alleged infringement and provide plaintiff's counsel with information about the same); Order for TRO (Doc. 12), *Seiko Epson Corporation v. Seller Account ADUNIS et al.*, 2:18-cv-07560-AB-FFM (C.D. Cal. Aug. 30 2018) at 6–8 (ordering non-party Amazon.com, Inc. and its affiliates to freeze assets and accounts and provide certain information to plaintiff's counsel).

[15] *See, e.g.*, *Chanel, Inc. v. Sunus Online Grp., LLC*, No. EDCV 13-2194-JGB-DTB, 2014 WL12558780, at *3 (C.D. Cal. Jan. 15, 2014) (declining to extend preliminary injunction order to any accounts with JP Morgan Chase and/or Bank of America in Defendants' names "as [plaintiff] has not connected these unidentified accounts to Defendants' infringing activities.")

[16] *See generally* April 23 Parhami Decl.; *see, e.g.*, *id.* ¶ 30 ("Our investigation revealed that Defendants direct members of the Facebook and Telegram groups to various online stores, generally hosted on the Shopify platform, to purchase the counterfeit products."); *id.* ¶ 37 ("Investigator made these [test] purchases using PayPal but also determined that Defendants' storefronts accept numerous other payment providers. In connection with making some of the purchases, Investigator communicated with these individuals via the Telegram group."); *id.* ¶¶ 38–42 (describing test

expensive for Patagonia to research and investigate Defendants' online activities, given Defendants' use of certain privacy features on these non-party platforms. *See* Escamilla Decl., ¶ 26. Given this evidence, the Court found that Non-Parties were best positioned to shut down the counterfeiting operation and preserve crucial evidence and assets before they can be destroyed, deleted, or depleted by Defendants. Doc. # 16 at 25–27. Despite the ample evidence showing extensive use of the Non-Parties' respective platforms and services by Defendants to accomplish their alleged counterfeiting scheme, it was not clear that Non-Parties had notice of Defendants' use of their respective platforms in the alleged counterfeiting scheme, and therefore it was not clear that these Non-Parties fell under the scope of entities who could be bound by the terms of injunctive relief. Fed. R. Civ. P. 65(d).

For these reasons, and for due process concerns, the TRO specifically named Non-Parties, but did not directly enjoin them. Rather, once served with the TRO, the non-parties were directed to either (1) voluntarily undertake various steps to halt Defendants' counterfeiting operations on their respective platforms, freeze Defendants' assets connected with counterfeiting, and to provide potentially relevant evidence to Patagonia, or (2) show cause within seven days of the issuance of the TRO why they should not be ordered to comply with the TRO. Doc. # 23 at 17.

### (a)   Patagonia Has Provided Evidence of Actual Notice to All Non-Parties Named in the TRO Except Telegram

"The court may issue a preliminary injunction only on notice to the adverse party." Fed. R. Civ. P. 65(a)(1). Patagonia served the TRO on May 7, 2025 on PayPal and on May 14, 2025 on Shopify and Meta, and the order extending the TRO on Meta, Shopify, and PayPal on May 21, 2025. Doc. # 74 (May 28 Declaration of Ryan Re: Service of Defendants and Non Parties, "May 28 Bricker Decl.") ¶ 5. Patagonia has thus provided Meta, Shopify, and PayPal notice of Patagonia's lawsuit and the TRO,

---

purchases from Defendants' online storefronts hosted on Shopify where PayPal was used for payments); *see also* Doc. # 16 at 25–27.

1    including the extension of the TRO. May 28 Bricker Decl. ¶ 5. Each of these entities
2    have been in communication with Patagonia about the TRO and this case, and Meta
3    has appeared before this Court. Thus, the Court finds that these non-party entities now
4    have actual knowledge of Defendants' activities and have had an opportunity to be
5    heard in this Court if they had an objection to being ordered to avoid aiding and
6    abetting Defendants' conduct. *See cPanel, LLC*, 719 F. Supp. 3d at 1155 (citing *Inst.*
7    *of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 950 (9th Cir.
8    2014)).

9        It is presently unclear whether non-party Telegram has been provided actual
10   notice of this matter, however. Patagonia reports its service status as "Bad
11   address/party no longer at agent for service of process's address on Secretary of State
12   website." May 28 Bricker Decl. ¶ 5. And despite having served Telegram at "all known
13   email addresses," unlike the other non-parties, at both the May 21 and June 3 hearings,
14   counsel for Patagonia reports that it has not received any response from Telegram
15   whatsoever. *See* May 28 Bricker Decl. ¶ 5. Based on these facts, the Court cannot
16   include Telegram in the terms of this preliminary injunction at this time.

17                    **(b)    The Court Declines to Enjoin Non-Party PayPal**

18       Patagonia has informed the Court that PayPal Holdings, Inc. has undertaken
19   many of the requested actions voluntarily and that Patagonia is in contact with its
20   counsel. Doc. # 29, May 16, 2025 Declaration of Louis Ferrari In Support of
21   Application For Extension of Temporary Restraining Order and to Extend Date For
22   Serve ("May 16 Ferrari Decl.") ¶ 5; Doc. # 25 Parhami Declaration in Support of
23   Application for Extension of Temporary Restraining Order and to Extend Date for
24   Service filed May 13, 2025 ("May 13 Parhami Decl.") ¶¶ 4-5. Patagonia has not
25   presented any evidence that after PayPal received notice of the alleged counterfeiting
26   it knowingly provided support to Defendants. Based on this, the Court finds that PayPal
27   has received actual notice of the TRO, but also that its conduct does not show that it is
28   "in active concert or participation" with Defendants or their officers, agents, servants,

employees, and attorneys. Fed. R. Civ. P. 65(d)(2). To the contrary, PayPal has indicated its willingness to enforce the rights of a trademark holder against likely trademark infringement activity on its platform. Therefore, the Court finds that on this record PayPal falls outside the scope of those who can be named in the specific terms of the preliminary injunction.

### (c)    The Court includes Meta in the Preliminary Injunction

As Meta details in its response to the TRO, Patagonia has provided detailed allegations of Defendants' extensive use of Meta's platform Facebook in Defendants' alleged counterfeiting scheme. Doc. # 59 at 8–9. And as described above, Patagonia has supported these allegations with ample evidence that other courts have found sufficient to bind specific non-parties in the terms of injunctive relief.

Although the TRO ordered Meta to show cause why it should not have to comply with the Court's order, the Court did not shift the burden to Meta on this issue. Indeed, Patagonia first provided evidence showing that Defendants' counterfeiting operation relied on using Meta's Facebook groups to promote, market, and sell counterfeit Patagonia products, and relied on the Facebook privacy settings to avoid detection. *See generally* April 23 Parhami Decl. In other words, if Meta did not take action, Defendants' use of Meta's platform was "highly likely to cause a violation of an injunction." *See cPanel, LLC*, 719 F. Supp. 3d 1133, 1155 (D. Or. 2024). However, the Court declined to enjoin Meta in the first instance, so that Meta could first receive notice of the counterfeiting activities that were employing Meta's platform and services and would have the opportunity to explain why it could not provide the assistance the Court found was necessary prevent Defendants' violations of the TRO. Fed. R. Civ. P. 65(d).

Since it was served with the TRO, Meta now indisputably has knowledge of the alleged counterfeiting scheme. Meta argues that its actions after receiving notice make clear that it is not aiding and abetting Defendants, asserting that it "has voluntarily taken good faith steps to address the third-party conduct at issue" and that it "intends

25

to assist Plaintiff and investigate the alleged unlawful conduct at issue based on the information provided." Doc. # 59 at 1, 11.

But Meta has stopped short of providing Patagonia with meaningful assistance as described in the TRO and has not offered an adequate explanation for its failure to do so. Meta claims that the terms of the TRO are vague, and that Patagonia must first provide it with URLs for offending websites before Meta will disable and preserve this information. Doc. # 59 at 11. But Meta has provided no evidence that it *requires* URLs to identify additional pages operated by Defendants. Indeed, it appears that Meta swiftly disabled two Facebook groups in this case before it was provided with URLs. *See* Doc. # 70 ¶¶ 4–10. The Court does not find it plausible that Meta cannot preserve and disable anything more than these two pages and the specific pages Patagonia identified by URL, given the detailed evidence of the alleged counterfeiting operation that Patagonia has provided to Meta.

Meta's stated concern about violating the Stored Communications Act ("SCA"), 18 U.S.C. § 2701 also does not explain why Meta has refused <u>entirely</u> to produce any information to Patagonia about Defendants or the alleged counterfeiting at issue here. For example, Meta has not adequately explained why it has not produced record information about Defendants that are not user communications. *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1104 (9th Cir. 2014) ("[T]he Stored Communications Act generally precludes a covered entity from disclosing the contents of a communication, but permits disclosure of record information like the name, address, or client ID number of the entity's customers in certain circumstances."). Accordingly, the Court finds that Meta's stated objections do not explain why Meta's assistance has been limited to disabling and freezing only those Facebook pages specifically identified by Patagonia by URL.

It appears that Meta's refusal to provide anything above the bare minimum assistance it would provide in response to a garden-variety take-down request boils down to chafing at being required "to undertake Plaintiff's investigation." Doc. # 59

26

at 2. This sentiment is not well taken. It is appropriate for Meta to conduct an investigation pursuant to a Court order that identifies an alleged counterfeiting operation that depends on Meta's services. Indeed, as the Court previously found, and as it finds now, Meta is best positioned to shut down the alleged counterfeiting operation at issue here and to preserve crucial evidence before it can be destroyed. Doc. # 23 at 20.[17]

Based on Meta's detailed knowledge of the alleged counterfeiting operation at issue on its platform, Meta's unique ability to provide Patagonia with crucial assistance and information, and its unexplained failure to provide Patagonia with basic assistance, the Court finds that Meta knew that its conduct was highly likely to shield Defendants' continued violations of TRO. Accordingly, the Court finds that it is appropriate to include Meta in the terms of this preliminary injunction order as described below.

### (d) The Court includes Shopify in the Preliminary Injunction

Shopify did not seek to appear before this Court, even in a limited capacity to contest jurisdiction, after being ordered to do so. It has not filed any opposition to Patagonia's request for a preliminary injunction, and it has not communicated with this Court in any way. Accordingly, the Court finds that Shopify has waived any argument in opposition to being enjoined by the terms of this preliminary injunction. *See Taferner*, 2025 WL 942498, at *11; C.D. Cal. L. Civ. R. 7-12.

In its email correspondence with Patagonia, Shopify claimed that the Court did not have personal jurisdiction over Shopify because Shopify is a Canadian corporation. *See* Doc. # 71-4. "Nonparties who reside outside the territorial jurisdiction of a district court may be subject to the court's jurisdiction if, with actual notice of the court's order, they actively aid and abet a party in violating that order. This is so despite the absence of other contacts with the forum." *S.E.C. v. Homa*, 514 F.3d 661, 674–75 (7th

---

[17] The Court notes that, now that Meta has disabled several Facebook groups identified by Patagonia, Meta may now be the only entity with full access to information about others involved in Defendants' alleged counterfeiting scheme. If Meta fails to provide this information to Patagonia promptly, there is a substantial risk that potential accomplices will continue the scheme or destroy relevant evidence.

Cir. 2008); *Waffenschmidt v. MacKay*, 763 F.2d 711, 714 (5th Cir. 1985) (same).

After Shopify was provided with detailed information of the alleged counterfeiting operation, and information showing that its assistance was crucial to halt Defendants' alleged misconduct, Shopify refused to do more than take down specific, individual counterfeit goods that Patagonia identifies on its website. Doc. # 71-4. Indeed, several of the Shopify-hosted webpages identified by Patagonia remain in operation as of June 3, 2025. *See* Doc. 71-1 ¶ 5. And Shopify has refused to provide information associated with storefronts operated by defendant Lee William or Putian to assist Patagonia in serving these defendants. Doc. # 49 ¶¶ 13, 21.

Accordingly, the Court finds that Shopify's continued provision of services to Defendants after it received notice that its services were being used to further an alleged counterfeiting scheme, and Shopify's refusal to provide Patagonia with any meaningful assistance in halting this counterfeiting scheme, establish that Shopify is "in active concert of participation" with Defendants. Fed. R. Civ. P. 65(d)(2). The Court thus finds it appropriate to bind Shopify to the terms of this preliminary injunction as described below.

### 3.    Expedited Discovery

Federal Rule of Civil Procedure 26 states that "[a] party may not seek discovery from any source before the parties have conferred as required by Rule 26(f) except in a proceeding exempted from initial disclosure under Rule 26(a)(1)(B), or when authorized by these rules, by stipulation, or by court order." Fed. R. Civ. P. 26(d). This Court's standing order for civil cases "allows discovery to commence as soon as the first answer or motion to dismiss is filed[.]" Standing Order for Civil Cases Assigned to Judge Valenzuela at p. 8, § II.B.[18] Courts in the Ninth Circuit have found good cause for expedited discovery to enable plaintiffs in counterfeiting cases to identify: (1) accounts used for and transactions associated with infringing sales; (2) original sources of and pending shipments of counterfeit products; and (3) other parties involved in

---

[18] Standing Order available at https://www.cacd.uscourts.gov/honorable-cynthia-valenzuela.

1  counterfeiting activities.[19]

2      The Court found good cause and finds continuing good cause to allow Patagonia

3  to conduct expedited discovery from Defendants and non-parties to ensure that

4  Patagonia can identify the full scope of infringing activities, halt the manufacture and

5  distribution of counterfeit products and resulting irreparable harm while this case is

6  pending, and identify potential sources for equitable relief for the harm suffered by

7  Patagonia. Doc. # 23 at 21.

8      The Court finds the need for early discovery outweighs any prejudice from

9  having to produce discoverable information sooner rather than on the normal

10 timeframe for discovery. Accordingly, all parties may pursue expedited discovery as

11 set forth below.

12              **4.    Asset Freeze**

13     Patagonia seeks to perpetuate the portion of the TRO that prevents Defendants

14 from depleting assets connected with sales of counterfeit Patagonia products to

15 preserve the possibility of equitable relief, including an accounting and a return of

16 Defendants' ill-gotten gains from counterfeiting.

17     When a plaintiff seeks equitable remedies under the Lanham Act, including

18 recovery of a defendant's profits under 15 U.S.C. § 1117, a district court has "inherent

19 equitable power to issue provisional remedies ancillary to its authority to provide final

20 equitable relief." *Reebok Int'l, Ltd.*, 970 F.2d at 559. This includes "the power to issue

21 a preliminary injunction in order to prevent a defendant from dissipating assets in order

22 to preserve the possibility of equitable remedies." *Id*. (quoting *Republic of the*

23 

---

24 [19] *See, e.g., Spy Optic Inc. v. Individuals, Partnerships & Unincorporated Associations Identified on
25 Schedule A*, No. CV 17-7649-DSF-KS, 2017 WL 10592133, at *2 (C.D. Cal. Nov. 27, 2017)
   (ordering eBay and PayPal to identify all funds transmitted to defendants' accounts and to provide
26 plaintiffs with data and accounting of all funds, accounts, and transactions); *SATA GmbH & Co. Kg*,
   2015 WL 6680807, at *11 (granting expedited discovery to ascertain sources of the counterfeit
27 products and learn of pending shipments of such products); *Sas v. Sawabeh Info. Servs. Co.*, No. CV
   11-04147 GAF-MAN, 2011 WL 13130013, at *6–7 (C.D. Cal. May 17, 2011) (granting expedited
28 discovery to get evidence for preliminary injunction, identify others involved in counterfeiting, and
   preserve evidence).

*Philippines v. Marcos*, 862 F.2d 1355, 1364 (9th Cir. 1988) (en banc)). The Ninth Circuit has explained that "it is essential that the trial courts carefully fashion remedies which will take all the economic incentive out of trademark infringement," and affirmed the district court's granting of TROs and preliminary injunctions to freeze the defendants' assets, in addition to preventing various counterfeiting-related activities. *Id*. at 559 (quoting *Playboy Enters., Inc. v. Baccarat Clothing Co.*, 692 F.2d 1272, 1275 (9th Cir. 1982)). Courts within the Ninth Circuit have recognized that the authority to freeze assets is "not limited to freezing specific identified assets, nor to assets within th[e] District or the U.S., and can extend to banks and other non-parties that have custody of Defendants' assets or provide payment services to Defendants." *Cisco Sys.*, 2020 WL 5199434, at *11 (citing *Reebok Int'l Ltd. v. Marnatech Enters., Inc.*, 737 F. Supp. 1521, 1527-28 (S.D. Cal. 1989) (TRO and preliminary injunction that any banks and financial institutions "who receive actual notice of this order…preliminary enjoined from transferring, disposing of, or secreting any money, stocks or other assets of these defendants, until further order of the court" except in limited circumstances)).

Patagonia has already met the standards for granting a preliminary injunction enjoining Defendants' counterfeiting activities. In addition, "[a] party seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted." *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009). Given the deceitful and secretive nature of counterfeiting, courts in the Ninth Circuit regularly find that dissipation of assets is likely and grant asset freezes in cases involving willful counterfeiting, particularly overseas where defendants can hide assets from a potential judgment.

In *Chanel, Inc. v. Sunus Online Group, LLC*, No. EDCV 13-2194-JGB-DTB, 2014 WL 12558780, at *1 (C.D. Cal. Jan. 15, 2014), the defendants sold counterfeit handbags and wallets online. The court found "based on Defendants' blatant violations of trademark laws there is likelihood that Defendants would transfer or hide the

30

illegally obtained assets in order to avoid a judgment in this action," and thus, granted a preliminary injunction freezing their assets. *Id.* at *3 (noting that while this "may harm [the defendants], when weighing this harm against the counterfeiting activities that have harmed Chanel, the balance of equities tips in Chanel's favor."). Other district courts have found that asset freezes were warranted to preserve assets in counterfeiting cases, particularly where the defendants operate overseas or online.[20]

Here, Patagonia seeks recovery of Defendants' profits from their wrongful use of the PATAGONIA Marks in connection with Defendants' sales of counterfeit Patagonia products, among other relief. Compl. at Prayer ¶ 14. The Court was thus well within its authority to issue an asset freeze as part of the TRO. The Court included this limited asset freeze out of a concern that Defendants could easily move funds out of the country, given their connections to manufacturers in China and given the online nature of Defendants' business. Doc. # 23 at 23.

Since issuing the TRO, Patagonia has obtained additional information about Defendants' finances suggesting that an asset freeze is appropriate as part of this preliminary injunction order. Patagonia has informed the Court that pursuant to the TRO, PayPal has taken steps to prevent Defendants from access to three PayPal accounts with balances as follows: $3,578.30, $7,426.55, and $19,918.25. May 13

---

[20] *See, e.g.*, *Cisco Sys.*, 2020 WL 5199434, at *11 (issuing TRO and then preliminary injunction freezing assets of Chinese defendants who were selling counterfeit transceivers online); *Reebok.*, 737 F. Supp.at 1527 ("[d]ue to the international aspect of the defendants' business, the Court is concerned that unless the assets are frozen, defendants may hide their allegedly ill-gotten funds."), *aff'd*, 970 F.2d at 563 (9th Cir. 1992); *Levi Strauss & Co.*, 51 F.3d at 987–88 (affirming preliminary injunction freezing assets of U.S.-based defendants who arranged for making counterfeit jeans in China; *Juul Labs, Inc. v. Unincorporated Associations Identified in Schedule a*, No. 1:18- CV-1063, 2018 WL 4473586, at *1 (E.D. Va. Sept. 18, 2018) (granting TRO freezing each of the defendant's PayPal accounts to prohibit transfer of assets where Chinese defendants were selling counterfeit JUULpods online). Courts have noted the difficulty of enforcing U.S. judgments in China. *Yee v. NIVS Intellimedia Tech. Group, Inc.*, No. CV 11-8472-JGB-AJW, 2013 WL 1276024, at *5 (C.D. Cal. Mar. 25, 2013) (stating that the Chinese company whose executives are Chinese residents "bore no real risk of sanctions" given the difficulty of enforcing a U.S. judgment against a Chinese national); *Redwen v. Sino Clean Energy, Inc.*, No. CV-11-3936-PA-SS, 2013 WL 12303367, at *5–6 (C.D. Cal. Jul. 9, 2013) (finding that the plaintiff "would face significant obstacles in enforcing any judgment against the defendants' assets in China").

Parhami Decl. ¶ 4; May 28 Bricker Decl. ¶ 6. Patagonia has also learned from PayPal that "significantly greater assets had been transferred out of those accounts, as the funds are transferred quickly after a transaction is consummated." Parhami Decl. ¶ 4.

Patagonia also has informed the Court that PayPal Holdings, Inc. identified accounts to which funds from the frozen PayPal accounts identified with counterfeit transactions were transferred. May 13 Parhami Decl. ¶¶ 4–5. Patagonia served document subpoenas on two of the identified domestic banks to which funds from the frozen PayPal accounts were transferred. May 16 Ferrari Decl. ¶¶ 15–18; May 28 Bricker Decl. ¶ 5 & Exs.1–2. Patagonia also served the two banks with the TRO (and the order extending the TRO), requesting that they take steps to ensure that the Defendants do not violate the order with respect to funds that were transferred to Defendants' accounts from the identified PayPal accounts. May 28 Bricker Decl. ¶ 5. The accounts and other accounts at banks outside the United States identified by PayPal Holdings, Inc. are shown on **Exhibit C[21]**.

Because the evidence shows (1) Defendants have a pattern of quickly transferring proceeds from the alleged counterfeiting to a number of financial institutions, including several located outside the United States, (2) Defendants have engaged in a blatant counterfeiting scheme infringing on Patagonia's trademarks; (3) Defendants have not complied with several terms of the TRO, including those that require them to provide information about the assets obtained pursuant to the alleged counterfeiting scheme (Doc. # 23, at 27, ¶ 5),[22] the Court finds that Patagonia has

---

[21] Consistent with the Court's Order (Doc. # 51) granting Patagonia's sealing request, bank account and debit card numbers in Exhibit C have been redacted for the public-facing version of this Order on the public docket. The sealed version of this Order shall be disclosed only to financial institutions and entities that need it to carry out the Court's directives. Recipients of the unredacted Order must keep its contents confidential, secure, and use them solely for the purposes set forth herein.

[22] The Court has sought to limit the asset freeze to accounts that Patagonia has shown are linked to Defendants' alleged counterfeiting. To date, the Represented Defendants have provided neither the Court nor Patagonia with any information about the accounts at issue that would allow for a more narrowly tailored order, if one were appropriate. This is despite specific requests from Patagonia's counsel and a warning that failing to provide such information would violate the TRO. *See* Doc. #

demonstrated a likelihood of dissipation of the proceeds of Defendants' sale of counterfeit Patagonia products if an asset freeze is not ordered here. Accordingly, the Court orders the freeze of assets as described below.

### C.    Bond

"The district court is afforded wide discretion in setting the amount of the bond, and the bond amount may be zero if there is no evidence the party will suffer damages from the injunction." *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003) (cleaned up); *see also Beyond Blond Prods., LLC v. Heldman*, 479 F. Supp. 3d 874, 890 (C.D. Cal. 2020) (no bond required where there was no evidence that infringing defendants would suffer damages by issuance of the injunction).

Represented Defendants argue that they are entitled to "a proper bond" but offer no proposal or evidence for how they would be prejudiced absent a bond. Doc. # 68 at 15. Represented Defendants state that Patagonia's "request of $5,000 is outrageous considering the extreme measures they are seeking against Defendants that have already to this point been implemented, including freezing bank accounts and assets." *Id*.[23]

At the June 4, 2025 hearing, the Court asked counsel for the Represented Defendants to clarify their position on a bond. Counsel offered neither an estimate of an appropriate amount nor any specific prejudice the Represented Defendants would suffer from even the broader preliminary injunction proposed by Patagonia. Accordingly, the Court finds that Defendants have not demonstrated a need for a bond. *Id*. Based on the clear evidence of Defendants' counterfeiting on the record presently before the Court, the Court finds it appropriate to issue the requested preliminary injunction without requiring Patagonia to provide security.

---

71-1, Exh. 2. Defendants may apply for a modification of the terms of this PI to allow for the payment of ordinary living and business expenses.

[23] Patagonia has not requested a $5,000 bond. Its Renewed Application for a TRO, Patagonia requested no bond, but noted "[i]f the Court is inclined to require a bond, Patagonia requests it to be for no greater than $5,000." Doc. # 16 at 31.

IV.    **PRELIMINARY INJUNCTION ORDER AS TO DEFENDANTS WHO HAVE BEEN SERVED**

Based on the foregoing, the Court finds there is good cause to **GRANT** Patagonia's request for Preliminary Injunction as to the Defendants who have been served with the TRO and related papers. Those Defendants include Francis Agnew aka Francis Marie Agnew or Fran Calista**,** Fran Calista Closet LLC**,** Shop ORC LLC**,** Jeffrey Francis Moore**,** Alison Rae Feaster**,** Brooke L. Hunsucker aka Brooke Leann Allen**,** Bailey Renae Miller**,** All Things Ali, LLC, Colson Ty Agnew, and Lee William ("Served Defendants").

The Court **ORDERS** as follows:

A.    **IT IS ORDERED** that Served Defendants, and each of their respective officers, agents, privies, shareholders, principals, directors, licensees, attorneys, servants, employees, affiliates, subsidiaries, successors, and assigns, and all those persons acting in concert or participation with any of them, and any entity owned or controlled by any of the Served Defendants, who receives actual notice of the order by personal service or otherwise, are enjoined, for the pendency of this lawsuit, from:

1.    Manufacturing, importing, buying, promoting, photographing, advertising, offering, or selling products identified as "Patagonia," or that display any of the PATAGONIA Marks or any similar marks, logos, or designs, or that replicate the design of Patagonia's products (all such products referred to here as "Alleged Counterfeit Products").

2.    Operating, participating in, or administering any platform, social media group, or shopping site that discusses, displays, identifies, promotes, offers for sale, or provides any links to Alleged Counterfeit Products. If compliance with this paragraph would require destroying or deleting any of the items listed below in

paragraph A.3 or A.7, Defendants must first promptly confer with

counsel for Patagonia to agree to a reasonable preservation plan

before taking any action that would destroy or delete any of the

items in paragraph A.3 or A.7 below.

3.  Destroying or deleting any products, business records, posts,

listings, advertisements, labels, photos, purchase orders,

importation records, sales records, shipment records, production

or inventory records, account records related to payment

processing accounts, credit card processing accounts, or bank

accounts, or communications associated with or that mention

the Facebook group "ORC Shop," the Facebook group "ORC

Style Guide," and/or the Telegram group "ORC Shop"

(hereinafter, "Social Media Groups"), the Served Defendants'

Shopify websites, or any other websites to which Served

Defendants directed members of the Social Media Groups, or

any other records related to the production, importation,

promotion, advertisement, purchase, shipment, or sale of Alleged

Counterfeit Products.

4.  Moving, transferring, withdrawing, or paying any funds –

wherever located, including in credit and debit card, or payment

processing accounts, or any accounts held at banks or other

financial institutions – that were used in connection with any of

the e-commerce shopping sites identified in the attached **Exhibit

A,** in connection with Served Defendants' Social Media

Groups, or the sale of Alleged Counterfeit Products.

5.  Gaining physical or electronic access to or directing any

activities within any merchant credit or debit card or payment

processing accounts, or any accounts held at banks or other

35

financial institutions that were used in connection with any of the
e-commerce shopping sites identified in the attached **Exhibit A,**
in connection with Served Defendants' Social Media Groups, or
the sale of Alleged Counterfeit Products. The Served Defendants
also are restrained from any physical or electronic access to the
accounts shown on **Exhibit C** to the extent that these accounts
belong to Served Defendants and contain proceeds from the e-
commerce shopping sites identified in **Exhibit A,** the Social
Media Groups, or the sale of Alleged Counterfeit Products.

6.    Transferring ownership of the e-commerce stores identified in
**Exhibit A,** or any other online storefronts that were involved
in the sale of Alleged Counterfeit Products.

7.    Deleting, obscuring, or transferring computer files relating to the
use of any e-commerce stores identified in **Exhibit A,** or any
other online storefronts that were involved in the sale of Alleged
Counterfeit Products.

8.    Instructing any other person or entity to engage in any of the
activities enjoined by this Order.

B.    **IT IS FURTHER ORDERED** that, within seven (7) days of entry of
this Order, Served Defendants shall:

1.    Provide service of this Order or subsequent permanent injunction
to all social media platforms, ecommerce sites, platforms, or hosts,
electronic payment processing platforms, merchant credit card
accounts, and messaging apps where Served Defendants have
accounts.

2.    Provide Patagonia and this Court with the names, addresses, and all
other contact information in their possession (e.g., telephone
numbers, fax numbers, email addresses) for (a) the source of

Alleged Counterfeit Products and related packaging, labels, or sundries, including all manufacturers, distributors, jobbers, shippers, and/or suppliers, and (b) all persons or entities to whom Served Defendants have sold, distributed, stored, or supplied Alleged Counterfeit Products or related packaging, labels, or sundries.

3. Recall from all distributors, retailers, or other recipients any and all Alleged Counterfeit Products and related packaging, labels, or sundries sold or distributed and deliver such recalled items to Patagonia's counsel.

4. If known to Served Defendants, identify to Patagonia all accounts or any other locations where any funds reside that were obtained from Served Defendants' sale of Alleged Counterfeit Products.

5. Identify to Patagonia all merchant credit and debit card accounts used by Served Defendants in connection with the promotion and/or sale of Alleged Counterfeit Products by Served Defendants.

C. **IT IS FURTHER ORDERED** that within thirty (30) days of this Order, each Served Defendant shall file with this Court and serve upon Patagonia's counsel a written report under oath setting forth in detail the manner in which they have complied with this Order.

D. **IT IS FURTHER ORDERED** that within seven (7) days upon receipt of this Order,[24] Shopify shall:

1. Refrain from any action that would permit Defendants to violate this Order.

2. Freeze and refuse access to Defendants to any accounts, funds

---

[24] The Court allowed alternative email service as to non-parties Meta, Inc., Telegram Messenger, Inc., Shopify, Inc., and PayPal Holdings, Inc. through the pendency of this action. Doc. #23 at 31. Given the Court's concerns about the email address for Telegram described above, however, the Court finds that service to Telegram at this email address is insufficient for service in this matter.

held in accounts, or merchant debit and credit card accounts that received proceeds from any e-commerce site identified in **Exhibit A.**

3. Preserve all account records and any associated data (including without limitation any content, posts, reviews, comments, communications, messages, or statements) for any shopping sites, social media pages, groups, or accounts, operated or controlled by Defendants.

4. Identify to Patagonia any accounts, individuals, or entities, to which funds were transferred from accounts or merchant credit and debit card accounts that were used in or received proceeds from any e-commerce site identified in **Exhibit A**.

5. Disable and suspend any e-commerce site shown in **Exhibit A**.

6. Produce to Patagonia records sufficient to identify all names, accounts, addresses, email addresses, phone numbers, and any other contact information for all individuals that share or hold control over any account owned or operated by any of the Defendants.

7. Produce to Patagonia the most recent twelve months of statements for any account over which Defendants have or share control that, during the statement period, contained any funds or assets.

E. **IT IS FURTHER ORDERED** that within seven (7) days upon receipt of this Order, Meta shall:

1. Disable Defendants' access to or administrative privileges to the Facebook group "ORC Shop" and the Facebook group "ORC Style Guide" or any other closed social media group used for promoting or selling clothing, apparel, and personal accessories.

2.  Preserve all account records and any associated data (including without limitation any content, posts, reviews, comments, communications, messages, or statements) for any shopping sites, social media pages, groups, or accounts, linked to, connected to, or otherwise associated with the Facebook group "ORC Shop," and/or the Facebook group "ORC Style Guide."

3.  Preserve all account records and any associated data (including without limitation any content, posts, reviews, comments, communications, messages, or statements) for any shopping sites, social media pages, groups, or accounts, linked to, connected to, or otherwise associated with any of the 14 individual Facebook accounts for Defendants (*see* Doc. # 59 at 12) or those that use the contact information for Defendants provided in **Exhibit B**.

4.  Disable links to any e-commerce site provided in the following Social Media Groups: the Facebook group "ORC Shop," and the Facebook group "ORC Style Guide."

5.  Produce to Patagonia records in Meta's possession sufficient to identify all accounts, social media groups, closed social media groups, social media pages, where any of the Defendants are an administrator or have an administrator that uses the contact information for Defendants provided in **Exhibit B.**

6.  Produce to Patagonia records in Meta's possession sufficient to identify the names, accounts, social media groups, closed social media groups, social media pages, addresses, email addresses, phone numbers, and any other contact information for all administrators of shopping sites, social media pages, groups, or accounts, linked to, connected to, or otherwise associated with

1    the Facebook group "ORC Shop," and/or Facebook group

2    "ORC Style Guide."

3        7.    Produce to Patagonia all pages from any social media group or

4    social media account owned or controlled by Defendants

5    showing any Patagonia-branded product or mentioning

6    Patagonia.

7    **F.**    **IT IS FURTHER ORDERED** that the Court may issue any other relief

8    that the Court may deem appropriate to prevent the trade and public

9    from deriving the erroneous impression that Defendants or Defendants'

10   businesses are associated or connected with Patagonia or that any goods

11   or services provided, promoted, or sold by Defendants are authorized by

12   Patagonia or are related in any way to Patagonia or its goods and

13   services. The Court may modify or dissolve the terms of this Order as

14   the interests of justice require.

15   **V.**    **EXPEDITED DISCOVERY ORDER**

16   **A.**    **IT IS FURTHER ORDERED** that all parties may proceed with

17   expedited discovery, pursuant to subpoena, 15 U.S.C. § 1116(d)(10)(B)

18   or Rules 30, 33, 34, 36, and 45 of the Federal Rules of Civil Procedure,

19   including upon third parties.

20   **VI.**    **SECURITY BOND**

21   **A.**    **IT IS FURTHER ORDERED** that given Patagonia's ability to

22   demonstrate a likelihood of success on the merits and the lack of harm

23   to Defendants, the Court has determined that no bond is necessary.

24   *Google LLC v. NAO Tsargrad Media, et al.*, No. 5:24-cv-05423-EJD,

25   2025 WL 964692, at *14 (N.D. Cal. Mar. 31, 2025) (no bond is

26   necessary because there was no realistic likelihood of harm to the

27   defendant).

28

40

1       **IT IS SO ORDERED**.

2    Dated:  6/5/25

3                                                    _Cynthia Valenzuela_
                                              HON. CYNTHIA VALENZUELA
4                                             UNITED STATES DISTRICT JUDGE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

1

**EXHIBIT A**

2

| **Shopify Store Name** | **URL** |
|---|---|
| ORC Fun Buys | https://orcfunbuys.com/ |
| ORC Boutique | https://orcboutique.com/ |
| ORC Yong | https://orcyong.com/ |
| Ali-Ali1 Shop | https://ali-ali1shop.com/ |
| Bwalishop | https://bwalishop.com/ |
| Dings ORC Shop | dingsorcshop.com |
| Kalvins Shop | www.kalvins.shop |
| Frank's Shop | www.frankorc.fun |
| ORC Shop | www.super-elevenshop.com |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT B

**EXHIBIT B**

| Name | As known by Name(s) | As known by Email Addresses | As known by Online Storefronts | Possible Address/Phone Number |
|---|---|---|---|---|
| Francis Agnew | Frances Marie Miller, Fran Calista, Fran Agnew, Fran N. Agnew, Frances M. Agnew | orcboutique. com@conta ctprivacy.c om<br><br>465436026 @qq.com<br><br>store+6552 3056809@ t.shopifye mail.com<br><br>frankchooo w@gmail. com<br><br>sz6945837 88@gmail. com | www.supereelevens hop.com<br>https://orcboutique .com | 2707 Skimmer Point Way S, Gulfport, Florida 33707 |
| Fran Calista Closet LLC | | | | 6150 Gulfport Blvd, Apt. 406, Gulfport, Florida 33707 |
| Shop ORC LLC | | Store+69074 223358@t.s hopifyemail. com<br><br>orcfunbuys | www.orcfunbuys.c om<br>www.supereelevens hop.com | 6150 Gulfport Blvd, Apt. 406, Gulfport, Florida |

| | | @gmail.com orcfunbuys.com@contactprivacy.com | | 33707 |
|---|---|---|---|---|
| Jeffrey Francis Moore | Jeff Moore | store+2462892036 7@t.shopifyemail.com orcshopboutique@gmail.com super-elevenshop.com@contactprivacy.com | www.supereleven shop.com | 2707 Skimmer Point Way S, Gulfport, Florida 33707 |
| Alison Rae Feaster | Alison Rae Akers, Ali Feaster | 1253534226@qq.com store+82081906990@t.shopifyemail.com leeo246889@gmail.com 1983630058@qq.com aliali1shop.com@contactprivacy.com 276610074@qq.com | www.aliali1shop.com https://cocococoshop.com/ https://mnfindshop.com | 5505 High Bank Rd, Fort Worth, Texas 76126 |

| Brooke L. Hunsucker | Brooke Leann Allen | leeo246889@gmail.com cy710303125@gmail.com 532662123@qq.com store+69947752665@t.shopifyemail.com | www.orcyong.com https://cocococoshop.com/ | 1203 62nd St, Meridian, Mississippi 39305 |
|---|---|---|---|---|
| Bailey Renae Miller | Bailey Miller | leeo246889@gmail.com Store+86404071703@t.shopifyemail.com 352114907@qq.com 276610074@qq.com orcfunbuys@gmail.com store+69074223358@t.shopifyemail.com | www.bwalishop.com www.orcfunbuys.com | 6400 Aster Ave, Midland, Texas 79707 |
| Lee William | | leeo246889@gmail.com 276610074@qq.com 1253534226@qq.com | www.aliali1shop.com www.orcyong.com www.bwalishop.com | Unknown |

| | | | | |
|---|---|---|---|---|
| All Things Ali, LLC | | | | 2707 Skimmer Point Way S, Saint Petersburg, Florida 33707 |
| Colson Ty Agnew | Colson T. Agnew, Colson Agnew | kalvinsunnies @gmail.com kalvins.shop @contactpriv acy.com store+275645 07229@t.sho pifyemail.co m | www.kalvins.shop | 6150 Gulfport Blvd. S. Apartment 406, Gulfport, Florida 33707 |
| Putian Lomando Trading Co., Ltd. | Putian Lognmao Trading Co. Ltd., Putian Licheng District Gold Carving and Jade Carving Company | Leeo246889 @gmail.com cy71030312 5@gmail.co m 532662123@ qq.com store+699477 52665@t.sho pifyemail.co m | www.orcyong. com | China, Fujian Province, Putian City, Chengxiang District, No. 171 Dongsha Village, Donghai Town, 351100 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT C

# EXHIBIT C

## Banks

| Bank Name: | Account Holder's Name: | Country: | Bank Info: | Bank Acct #: |
|---|---|---|---|---|
| JPMORGAN CHASE BANK, NA | fan jun | US | 28000024 | ███████████ |
| CHINA MERCHANTS BANK | fan jun | China | CMBCCNBS | ███████████ |
| Citibank, N.A., Hong Kong Branch | 范俊 | Hong Kong | 6 | ████████ |
| CHINA MERCHANTS BANK | fan jun | China | CMBCCNBSXXX | ███████████ |
| China Merchants Bank | 范 俊 | China | CMBCCNBS | ███████████ |
| CHASE* | zhong qing sheng guan dian zi shang wu you xian gong si | US | 28000024 | █████████ |
| JPMORGAN CHASE BANK, NA* | zhong qing sheng guan dian zi shang wu you xian gong si | US | 28000024 | █████████ |
| ZHEJIANG CHOUZHOU COMMERCIAL BANK | pu tian shi li cheng ou jin diao yu zuo shang xing | China | CZCBCN2X | ███████████ |

| | | | | |
|---|---|---|---|---|
| COMMUNITY FEDERAL SAVINGS BANK | 陈勇 | US | 26073150 | ▮▮▮▮ |
| Citibank, N.A., Hong Kong Branch | pu tian shi li cheng ou jin diao yu zuo shang xing | Hong Kong | 6 | ▮▮ |
| China Construction Bank (中国建设银行) | 陈勇 | CN | | ▮▮▮▮ |
| ZHEJIANG CHOUZHOU COMMERCIAL BANK | chen yong | C2 | CZCBCN2X | ▮▮▮▮ |

*PayPal identified the accounts with an asterisk to be associated with Defendant Lee William.

**Credit Cards**

| Account Holder's Name: | CC Number: | Exp Date: | Currency: | Issuer: |
|---|---|---|---|---|
| 俊 范 | REDACTED7828 | REDACTED | USD | China Merchants Bank |
| 俊 范 | REDACTED3782 | REDACTED | USD | China Merchants Bank |
| 俊 李* | REDACTED0293 | REDACTED | CNY | Pingan Credit Card |
| Jun Li* | REDACTED4790 | REDACTED | USD | China Merchants Bank |
| 勇 陈 | REDACTED2737 | REDACTED | CNY | Bank of China |
| 勇 陈 | REDACTED1043 | REDACTED | CNY | China |

| | | | | Construction Bank |
|---|---|---|---|---|

*PayPal identified the accounts with an asterisk to be associated with Defendant Lee William.

### **Debit Cards**

| DC Number: | Exp Date: | Issuer: |
|---|---|---|
| REDACTED5332 | REDACTED | China Merchants Bank |